**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case Nos. 3:23-po-84; 3:25-cr-14 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Peter B. Silvain, Jr. |
| | : | |
| ANDREW CROOKS, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**SENTENCING ORDER**

This Order supplements and explains this Court's sentencing of Defendant Andrew Crooks. (Doc. #93).[1] Defendant is a Jamaican national who entered the United States in 2012 on a visitor's visa which has since expired. (Doc. #89, *PageID* #1621). On August 27, 2023, Defendant engaged in a physical altercation with his former girlfriend, S.E. *Id.* at 1619. At the time, S.E. was a servicemember in the United States Air Force; stationed at Wright-Patterson Air Force Base (WPAFB). *Id*. at 1622. This altercation occurred at S.E.'s residence where she lived with Defendant, her two children from a previous relationship, and one child that the couple shared. (Doc #83, *PageID* #s 841, 843–44); (Doc. #86, *PageID* #s 1407, 1417, 1470). These three children, along with S.E.'s niece, witnessed and intervened in the physical altercation. *Id.*

Thereafter, Defendant was charged with five criminal counts, including (1) assault by striking, bearing, or wounding, in violation of 18 U.S.C. § 113(a)(4); (2) child endangerment, in violation of O.R.C. § 2919.22(A); (3) aggravated menacing, in violation of O.R.C. § 2903.21; (4)

---

[1] Citations to the record refer to case no. 3:23-po-84. Citations to documents in the appellate record include the 3:25-cr-14 case number.

domestic violence, in violation of O.R.C. § 2919.25; and (5) disorderly conduct by engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior, in violation of O.R.C. § 2917.11(A)(1).. (Doc. #1).

Prior to trial, and upon Defendant's motion, the undersigned dismissed Count 3 and Count 4. (Doc #66).  In mid-August 2024, the case proceeded to trial on the remaining counts. (Docs. #s 83–87). While Count 1 was tried in front of a jury, Count 2 and Count 5 were tried before the undersigned. (Doc. #11, *PageID* #66). After a four-day trial, the jury acquitted Defendant of Count 1. (Doc. #79). However, the undersigned found Defendant guilty of Count 2 and Count 5. (Doc. #81). At sentencing, as to Count 2, the undersigned sentenced Defendant to a 60 days of confinement, with 30 days suspended, 3 years of probation, and a $10 special assessment. (Doc. #93, *PageID* #s 1650, 1652). Regarding Count 5, the undersigned sentenced Defendant to a 1-year term of probation—to run concurrent with his 3-year term—and a $5 special assessment. *Id.*  In addition to the mandatory conditions of probation, the undersigned required Defendant to participate in a mental health assessment or counseling program, an educational service program, a vocational services program, and to find and maintain employment. *Id.* at 1651–52. Due to Defendant's immigration status, he was also required to cooperate with Immigration and Customs Enforcement (ICE) in any deportation proceedings. *Id.* at 1652.

On February 14, 2025, Defendant appealed the undersigned's guilty verdict and sentencing on the child endangerment and disorderly conduct offenses. (Case No. 3:25-cr-14, Doc. #1). On June 3, 2025, United States District Judge Thomas Rose affirmed Defendant's convictions but vacated his sentence for want of procedural reasonableness.  (Case No. 3:25-cr-14, Doc #11, *PageID* #78). Judge Rose remanded sentencing to the undersigned for the limited purpose of "mak[ing] appropriate findings consistent with 18 U.S.C. § 3553(a)." *Id.*

I.      **<u>Background</u>**

Defendant and S.E. were involved in a romantic relationship from 2016 to 2023. (Doc #83, *PageID* #841). S.E. described their relationship as "rocky," and one of her children recounted frequent yelling and arguments. *Id.* at 841; (Doc. #85, *PageID* #1138).  According to S.E., their relationship ended months before the altercation in August 2023. (Doc. #83, *PageID* #849).

At the time of the August 2023 altercation, Defendant and S.E. resided together at WPAFB with their biological child (K.C.) and two children from S.E.'s previous relationship (A.M. and K.M.). (Doc. #83, *PageID* #s 841–42); (Doc. #84, *PageID* #1060).  S.E.'s niece was also at the residence.  (Doc. #83, *PageID* #s 844).  All of the children were under the age of eighteen, with the oldest being about fifteen years old and the youngest being about five years old.  (Doc. #84, *PageID* #s 909, 1058); (Doc. #85, *PageID* #s 1123).

Defendant testified that he thought of S.E.'s children his own. (Doc. #86, *PageID* #1404). He was involved in their lives from their early childhoods and helped raise them with S.E. (Doc. #83, *PageID* #s 842, 849); (Doc. #85, *PageID* #s 1105–06, 1137–39); *Id.* at 1403–04.  As such, both of S.E.'s children considered Defendant a father figure in their lives, and S.E.'s minor niece considered Defendant as her uncle.  (Doc. #83, *PageID* #842); (Doc. #84, *PageID* #1059); (Doc. #85, *PageID* #s 1106, 1139).

On the night of August 27, 023, S.E. and Defendant were preparing dinner. (Doc. #83, *PageID* #s 843–44); (Doc. #86, *PageID* #1409). After retrieving ingredients for the meal, and while waiting for some ingredients to thaw, S.E. began speaking with a friend on the phone.  (Doc. #83, *PageID* #s 844-45). Defendant indicated to S.E. that he would take over preparing the meal, and S.E. decided to continue her phone conversation in the upstairs bathroom.  *Id.*; (Doc. #86, *PageID* #1410).  Defendant started washing the meat, but he could not get over the fact that she

was on the phone talking with someone else. (Doc. #86, *PageID* #1410). Wondering why S.E. went upstairs and who she was talking to, Defendant followed S.E. into the bathroom and saw S.E.'s phone on the countertop. *Id.* at 1410–11. After discovering that the caller was another man, Defendant grabbed S.E.'s phone and walked into K.C.'s room to interrogate the caller. *Id.* at 1411-12. Defendant asked the man questions trying to figure who he was and why he was talking to S.E. (Doc. #83, *PageID* #849); (Doc. #86, *PageID* #1414). S.E. followed Defendant into K.C.'s room to retrieve her phone. (Doc. #83, *PageID* #s 847–48). The man eventually hung up. *Id.* at 849. Defendant and S.E. argued, eventually making their way to the backyard. (Doc. #84, *PageID* #897); (Doc. #86, *PageID* #1421).

At trial, S.E. and Defendant offered conflicting testimony regarding the altercation, but particular facts are undisputed. While both were in the backyard, Defendant grabbed S.E. by the weave in her hair, using it to drag her on the grass. (Doc. #84, *PageID* #902); *Id.* at 1426. Defendant then stood on top of S.E., restraining her. (Doc. #84, *PageID* #904); (Doc. #86, *PageID* #1430). Each of the four kids noticed the altercation from inside the house. (Doc. #84, *PageID* #1063); (Doc. #85, *PageID* #s 1107, 1124). Three of the children—A.M., K.M., and C.W.—rushed outside to help S.E., grabbing, yelling, hitting, and pulling at Defendant. (Doc. #84, *PageID* #s 909, 1064); (Doc. #85, *PageID* #s 1109, 1125); (Doc. #86, *PageID* #1427). K.C. stood at the door crying. (Doc. #84, *PageID* #s 909, 1070); (Doc. #85 *PageID* #1125).

The altercation was noisy . (Doc. #84, *PageID* #1065). A husband and wife living nearby indicated that they were watching a movie inside of their home when they heard the altercation, which prompted them to investigate. *Id.*; (Doc. #85, *PageID* #1141). As they followed the sound, the screaming and yelling led them to S.E.'s backyard. *Id.* at 1141–43. The husband stated that, as he approached S.E.'s back gate, he heard screaming and someone yelling "he's going to hurt me."

4

*Id.* The husband entered the backyard and observed Defendant standing over S.E. in an "aggressive manner." *Id.* at 1144–46.  The husband indicated that the four children were nearby and upset at Defendant. *Id.* The husband intervened and convinced Defendant to leave the residence. *Id.* at 1145–46, (Doc. #84, *PageID* #1071); (Doc. #85, *PageID* #1137); (Doc. #86, *PageID* #1478).

At trial, Defendant claimed that he was acting in self-defense. (Doc. #86, *PageID* #1476). Defendant denied S.E.'s testimony that he was the aggressor and that he punched and strangled her. (Doc. #84, *PageID* #s 902–904); *Id.* at 1393, 1470. Instead, Defendant claimed that S.E. started the altercation, and he grabbed her hair only to stop her from attacking him. *Id.* at 1473, 1476. Defendant asserted that he restrained S.E. with a bear hug. *Id.* at 1470.  Defendant also stated that he believed the children's involvement was a reflection of their efforts to help end the altercation rather than a direct attack targeted toward him.  *Id.* at 1477. Defendant claimed that he released S.E. to reason with the children because "we always tried to avoid having anything around the kids." *Id.* at 1473. Instead, S.E. bit Defendant, which he felt left him with no choice but to continue restraining with the children present. *Id.* at 1477.

His recollection conflicted with the testimony of the neighbor and the children. They viewed Defendant as the aggressor—not S.E. (Doc. #84, *PageID* #1065); (Doc. #85, *PageID* #s 1112, 1135). A.M. recounted observing Defendant attacking his mother. (Doc. #85, *PageID* #1127). The three children who testified—A.M., K.M., and C.W.—all stated that they were attempting to restrain Defendant from causing S.E. harm. (Doc. #84, *PageID* #1065); (Doc. #85, *PageID* #s 1112, 1135). They also testified that A.M. armed himself with a baseball bat to try and subdue Defendant. (Doc. #84, *PageID* #s 1066–68); (Doc. #85, *PageID* #s 1109–10, 1126). While they tussled with Defendant, A.M. cursed at him. *Id.* at 1136.

The altercation appeared to have a negative impact on the children. At trial, one of the responding officers testified that the children were visibly shaken when he arrived. *Id.* at 1162. He explained that C.W. complained of back pain, stating that Defendant had shoved her off of him and onto the ground. *Id.* At trial, K.M. described witnessing and participating in the altercation as being traumatic. (Doc. #85, *PageID* #1117). S.E. described K.C crying and screaming, even after his cousin C.W. picked him up and tried to calm him down. (Doc. #84, *PageID* #912). She stated that K.C. is afraid to sleep alone because of the incident. *Id.* at 954. S.E. further testified that each of the children have been placed in therapy. *Id.* S.E. also alleged that A.M.—who had prior documented mental health concerns—has experienced exacerbated symptoms because of the altercation. *Id.* at 1042. She stated that, following the altercation, A.M. has attempted suicide multiple times. *Id.* at 954–55.

Defendant justified his actions and conduct before, during, and after the altercation. (Doc. #86, *PageID* #1465). He testified that, despite being aware that taking S.E.'s phone would make her mad, he did so anyway "because [he] felt like it at the time" and "[b]ecause [he] felt like she was on the phone talking to somebody and [he] felt bad about it." *Id.* at 1459–61. Defendant explained that he wanted "clarity with who she was on the phone with." *Id.* at 1465. When the children confronted him, Defendant stated that he "attempted to console them" and continued to restrain S.E. because he had to respond after she "bit[] and scratch[ed]" him. *Id.* at 1474-76. He dismissed the children's testimonies and video footage that depicted the children running away from him. *Id.* at 1479–80. Moreover, despite Defendant sending an apology text to S.E. after the altercation, he testified that he was apologizing for taking her phone, not the altercation. *Id.* at 1440-41. Defendant's stated purpose in sending the apology text was to "be able to still be in my children's life, not necessarily A.M. and K.M., but mainly for K.C." *Id.* at 1489.

After examining the facts and testimony at trial, the undersigned found Defendant guilty of child endangerment and disorderly conduct. (Doc. #87, *PageID* #s 1600–01).

Prior to sentencing, on November 13, 2024, United States Probation Officer Laura Hiegel filed a Presentence Investigation Report (PSR).  (Doc #89).  The PSR included findings that addressed Defendant's nature, background, and characteristics.  *Id.*  Specifically, the report noted that Defendant was born in Kingston, Jamaica.  *Id.* at 1621.  Defendant reported that he attended school until the tenth grade, and he does not have a GED.  *Id.* at 1624.  Defendant legally entered the United States at the age of 29 and was granted permission to remain until November 10, 2012.  *Id.* at 1621-22.  However, he remained in the United States after that date and "is considered to be in the U.S. illegally."  *Id.* at 1622.  As a result, Defendant may be subject to deportation.  *Id.*  The PSR noted that Defendant has not held steady employment since arriving in the United States. *Id.* at 1624.  At the time of the PSR, Defendant was residing at a homeless shelter in Brooklyn, New York.  *Id.* at 1623.  Moreover, he was diagnosed with major depressive disorder, generalized anxiety disorder, and cannabis use disorder and was participating in mental health treatment. *Id.* at 1623–24.  The PSR recommended a term of three years of probation and a $10 special assessment for child endangerment and a term of one year of probation and a $5 special assessment for disorderly conduct. (Doc # 89, *PageID* #1628).  The sentences were to run concurrently. *Id.* The PSR also recommended special conditions, including that Defendant participate in a mental health assessment or counseling program, an educational services program, and a vocational services program, that Defendant find and maintain employment, and that he cooperate with ICE during any deportation proceedings. *Id.* at 1629.

This Court held a sentencing hearing on February 7, 2025. (Doc. #92).  Both parties and the undersigned accepted the factual basis contemplated in the PSR.  *See* Fed. R. Crim. P.

32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."); *United States v. Scudder*, 764 F. App'x 454, 459 (6th Cir. 2018) (holding that the sentencing judge "was permitted to rely" on the PSR because the parties did not dispute the report's findings at the sentencing hearing).

Further, the undersigned asked both parties if they had any objections to the sentencing recommendation in the PSR. *Id.* at 1637. The Government asked the Court to consider "a term of confinement of 60 days for [Defendant's] violations" with regard to the child endangerment offense. *Id.* at 1638. The Government argued that this addition was appropriate when considering "the offense committed, . . . [Defendant's] lack of employment, lack of providing any type of support for his minor children, and the egregiousness of the conduct at issue in this case as a general deterrent, and the fact that [Defendant] is still in the United States illegally and has been for over 10 years." *Id.* at 1637.

Defendant's counsel did not object to the PSR's recommendation. *Id.* at 1638. However, counsel reiterated that Defendant was acting in self-defense following an assault perpetrated by S.E. *Id.* at 1639. The undersigned stated that self defense was not relevant in determining Defendant's sentence for child endangerment and disorderly conduct. *Id.* at 1638–39.

The undersigned largely adopted the PSR's recommendations but also sentenced Defendant to a term of confinement of 60 days—suspending 30 days—for the child endangerment offense. *Id.* at 1640; (Doc. #89, *PageID* #1627).

## II. <u>Standard of Review</u>

When sentencing a criminal defendant, the sentencing court "must consider all of the [sentencing] factors set forth in [18 U.S.C.] § 3553(a) to guide its discretion at sentencing." *Peugh v. U.S.*, 569 U.S. 530, 536 (2013) (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005)).

Under 18 U.S.C. § 3553(a):

The court, in determining the particular sentence to be imposed, shall consider--
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--
   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
      (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
      (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
   (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
(5) any pertinent policy statement--
   (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
   (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (footnote omitted).

Courts do not generally require a "ritual incantation" of the § 3553(a) factors. *United States*

*v. Humphries*, No. 23-3411, 2024 WL 1134628, at *2 (6th Cir. Mar. 15, 2024) (internal citations

omitted). Rather, in a court's analysis of the § 3553(a) factors, "often one or two [factors] prevail, while others pale." *United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007). But the judge must make sure that "their sentencing reasoning connects to or serves the purposes of at least the § 3553 requirements that it considers in that case." *Bridgewater*, 479 F.3d at 442.

### III.     <u>Discussion</u>

In rendering the sentence, the undersigned considered the record in this case, the PSR, and the parties' arguments. Ultimately, the undersigned adopted most of the recommendations in the PSR. However, the undersigned found the Government's argument for incarceration compelling and sentenced Defendant accordingly.

Before addressing the sentencing factors, it's important to first discuss the Assimilative Crimes Act (ACA). The ACA "assimilates into federal law, and thereby makes applicable on federal enclaves such as Army [and Air Force] bases, certain criminal laws of the State in which the enclave is located." *Lewis v. United States*, 523 U.S. 155, 158, 118 S. Ct. 1135 (1998). The ACA provides:

> Whoever within or upon any [federal enclave] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State ... in which such place is situated, ... shall be guilty of a like offense and subject to like punishment.

18 U.S.C. § 13(a).

"The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves." *Lewis*, 523 U.S. at 160 (citing and quoting parenthetically *Williams v. United States,* 327 U.S. 711, 718-19, 66 S.Ct. 778 (1946) ("ACA exists 'to fill in gaps' in federal law where Congress has not 'define[d] the missing offenses.'")) (other citations omitted). "Under the Act, if there is no federal criminal law on point, and if a defendant's conduct would have been a state-law crime but for the fact that it was committed on federal territory, it 'becomes

a federal offense....'"  *United States v. Pego*, 567 F. App'x 323, 329 (6th Cir. 2014) (quoting, in part, *United States v. Couch*, 65 F.3d 542, 543 (6th Cir. 1995)).

Here, Defendant's conduct occurred on a portion of a military installation—Wright-Patterson Air Force Base—over which the Government exercised jurisdiction.  The undersigned found Defendant guilty of two assimilated Ohio law offenses:  child endangerment in violation of Ohio Rev. Code § 2919.22(A)(1)) and disorderly conduct in violation of Ohio Rev. Code § 2917.11(A)(1).  Therefore, because Defendant was convicted under the ACA of "like offenses," he is subject to "like punishment," as provided by state law. 18 U.S.C. § 13(a); *Lewis v. United States,* 523 U.S. 155, 159 (1998); *United States v. Jensen*, 278 F. App'x 548, 550 (6th Cir. 2008); *United States v. Schoolcraft*, Case No. 3:06-po-15, 2007 WL 275935 at *1 (S.D. Ohio Jan. 25, 2007) (Merz, M.J.) ("Under the Assimilative Crimes Act, only the elements and penalties are assimilated.").

Under Ohio law, child endangerment—as a misdemeanor of the first degree—is punishable by not more than 180 days imprisonment and a fine of not more than one thousand dollars.  Ohio Rev. Code §§ 2919.22(E)(2)(a); 2929.24(A)(1); 2929.28(A)(2)(a)(i).  Disorderly conduct is punishable by a fine of not more than $150.  Ohio Rev. Code §§ 2917.11(E)(2); 2929.28(A)(2)(a)(v); *see* Ohio Rev. Code § 2929.26 ("No court shall sentence any person to a prison term for a misdemeanor or minor misdemeanor or to a jail term for a minor misdemeanor.").

However, in determining a sentence, the Court must follow federal sentencing procedure. 18 U.S.C. § 3551(a) (incorporating assimilated offenses into the "provisions of this chapter"); *see Jensen*, 278 F. App'x at 550.  For purposes of sentencing, federal statute groups its criminal offenses "by letter grades on the basis of the maximum sentence that can be imposed." *In re Solomon*, 465 F.3d 114, 119 (3d Cir. 2006); *see* 18 U.S.C. § 3559(b).  As relevant here, child

11

endangerment is considered a Class B misdemeanor. 18 U.S.C. § 3559(a)(7) ("[S]ix months or less but more than thirty days, as a Class B misdemeanor."). Disorderly conduct offense is considered an infraction because it does not carry an incarceration term. 18 U.S.C. § 3559(a)(9) ("[F]ive days or less, or if no imprisonment is authorized, as an infraction."); Ohio Rev. Code § 2917.11(E)(2)(a).

Under U.S.S.G. 1B1.9, "[t]he sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction." Accordingly, the sentencing guidelines do not apply in this case. Because the guidelines do not apply, the Court must focus on the § 3553(a)(2) factors. 18 U.S.C. § 3553(b)(1) ("In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2)."). Specifically, the Court must consider what type of punishment is needed (1) to reflect the seriousness of Defendant's two offenses; (2) afford adequate deterrence of Defendant's criminal conduct and provide just punishment for Defendant's offenses; (3) to protect the public from Defendant; and (4) to provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)–(D).

### A.    Confinement

The undersigned sentenced Defendant to 60 days of confinement—with 30-days suspended—for his child endangerment conviction. This term of incarceration reflects the seriousness of the offense and provides Defendant just punishment, while also promoting respect for the law and deter others from doing so in the future. § 3553(a)(2).

In this case, the nature of Defendant's relationship with the children, the number of children involved, and the age of the children (ranging from 5–15 years old) all weigh in favor of

incarceration. *See United States v. Schmidt*, 802 F. App'x 949, 956 (6th Cir. 2020) (finding Defendant "acted reprehensibly," in part because "[h]is actions irreparably harmed his own daughter, a friend's infant daughter, and a 13-year-old girl."); *United States v. Brown*, 239 F. App'x 243, 246 (6th Cir. 2007) ("The relationship of the victim to the defendant-whether a close friend, a family member, or a complete stranger-is a salient circumstance of the offense and the district court acts within its discretion when it increases or decreases a sentence based on that relationship …."). Defendant committed the offense in the presence four minor children— including his 5-year-old biological child, 12-year-old and 15-year-old children of his domestic partner, and 14-year-old niece of his domestic partner. (Doc. #83, *PageID* #s 841–42); (Doc. #84, *PageID* #s 909, 1058, 1060, 1093); (Doc. #85, *PageID* #1123). Defendant testified that he considered S.E.'s kids his own, (Doc. #86, *PageID* #1404), and S.E.'s children and niece testified that they saw him as a father figure and uncle, respectively. (Doc. #83, *PageID* #842); (Doc. #84, *PageID* #1059); (Doc. #85, *PageID* #s 1106, 1139). Defendant was involved in the children's daily lives and helped S.E. raise each of the children. (Doc. #83, *PageID* #s 842, 849); (Doc. #85, *PageID* #s 1105–06, 1137–39); (Doc. #86, *PageID* #s 1403–04). From his close relationship with them, Defendant knew, by engaging in a physical altercation with their mother, he would cause them harm.

Despite this, Defendant failed to cease his participation in the altercation when S.E. when the children came outside. With the children present, Defendant continued to restrain S.E. to respond to her actions. (Doc. #86, *PageID* #1476). Defendant also failed to stop when the children became involved. (Doc. #84, *PageID* #1065); (Doc. #85, *PageID* #1112, 1135). The children attempted to restrain Defendant to keep him from causing further harm to S.E., and one child— A.M.—even armed himself with a baseball bat and cursed at Defendant in an attempt to subdue

13

him. (Doc. #84, *PageID* #s 1066–68, 1136); (Doc. #85, *PageID* #s 1109–10, 1126). Even then, Defendant did not attempt to stop the altercation. Defendant continued to scream and yell at S.E., which drew the attention of neighbors. (Doc. #84, *PageID* #1065); (Doc. #85, *PageID* #1141). When the neighbors arrived at the backyard to investigate, one of the neighbors testified that he saw Defendant standing over S.E. in an "aggressive manner" as the children watched. (Doc. #85, *PageID* #1141–46).

In the aftermath, a responding officer testified that the children were visibly shaken and one child was treated with ibuprofen and an ice pack for back pain as a result of being shoved during the altercation. (Doc. #85, *PageID* #1162). Some of the children have also experienced fear when sleeping alone (Doc. #84, *PageID* #954), have expressed that the event was traumatic (Doc. #85, *PageID* #1117), or have attempted suicide on a number of occasions (Doc. #84, *PageID* #954–55). Each of the children have been placed in therapy to help them address these concerns. Three of the children have suffered harm as a result of watching the man they considered a father attack their mother, and one child suffered from watching a man she considered her uncle attack her aunt. *See United States v. McCaster*, 333 F. App'x 970, 974 (6th Cir. 2009) (sentencing closer to statutory maximum because defendant committed a violent act against a mother right in front of her two-year old child who was later "traumatized by what he had witnessed"); *United States v. Miller*, 817 F. App'x 119, 125 (6th Cir. 2020) ("The district court also considered other factors weighing *against* a shorter sentence—for example, that this was a very serious offense and that it occurred near an elementary school (putting children at risk).").  The children testified that, from their perspective, Defendant was the aggressor. (Doc. #84, *PageID* #1065); (Doc. #85, *PageID* #s 1112, 1135).

Defendant has also failed to take responsibility for his part in the physical altercation, which weighs in favor of incarceration.  In sentencing a defendant, a judge "may consider a defendant's refusal to accept responsibility and his lack of remorse." *Mondy v. Stephenson*, Case No. 22-11724, 2023 WL 4768181 at *7 (E.D. Mich. 2023).  Defendant never expressed regret over his part in the physical altercation. Instead, Defendant justified his actions and conduct before, during, and after the altercation. (Doc. #86, *PageID* #1465). Defendant dismissed the testimony of the children he called his own. *Id.* at 1479–80. Defendant did send a text apologizing to S.E. after the altercation, which on its own may be evidence of remorse. *Id.* at 1440–41. However, any presumption of remorse or regret is directly undone by Defendant's testimony. Defendant testified at trial that his apology encompassed only the taking of S.E.'s phone and not the altercation itself. *Id.* at 1440–41. Defendant further stated he used the text to "be able to still be in my children's life." *Id.* at 1489 (emphasis added).

Therefore, because Defendant victimized children who maintained a close, familial relationship with Defendant, used or threatened of violence in the presence of these children, caused harm or mental anguish to the children following the altercation, and failed to show remorse or regret before, during, or after the altercation or at trial, Defendant is sentenced to 60 days of confinement, with 30 days suspended.

**B.      Probation**

Under 18 U.S.C. § 3561(c), a defendant may be sentenced to not more than five years of probation for a misdemeanor and nor more than one year for an infraction.  *See also* 18 U.S.C. § 3564(b) ("Multiple terms of probation, whether imposed at the same time or at different times, run concurrently with each other.").  The court may provide special conditions to probation terms if "they are reasonably related to the factors set forth in section 3553(a)(1) [Nature and

15

Circumstances of Offense and History and Circumstances of Defendant] and (a)(2) [Need for Sentence Imposed] and to the extent that such conditions involve only such deprivations of liberty and property as are reasonably necessary for the purposes indicated in section 3553(a)(2)." 18 U.S.C. § 3563(b).

In this case, the PSR recommended that Defendant be sentenced to three years of probation for the child endangerment offense and one year for the disorderly conduct offense.  (Doc # 89, *PageID* #1628).  In addition to the standard terms of probation, the PSR recommended four special conditions, including that Defendant participate in a mental health assessment and/or counseling program, an educational services program, and a vocational services program, that Defendant find and maintain employment, and that he cooperate with ICE during any deportation proceedings. *Id.* at 1629.  These recommended special conditions reflected Defendant's educational, vocational, and mental health needs while also addressing his concerns regarding his potential deportation.

The undersigned adopted the PSR's recommended probation terms and special conditions. The recommended terms and conditions address Defendant's mental health issues and would provide him with "with needed educational or vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2)(D); *United States v. Childress*, 874 F.3d 523, 527 n.2 (6th Cir. 2017) ("A district court may impose a special condition based on any of several sentencing factors."); *United States v. Salisbury*, Case No. 23-2071, 2024 WL 5075401, at *7 (6th Cir. 2024) (noting that for a special probation condition, "direct relation [to the offense] is not required," so long as it is based on other sentencing factors like Defendant's history and circumstances).

16

C.     Fine

In determining whether to impose a fine, the sentencing judge must consider factors including defendant's income, earning capacity, financial resources and if the defendant owed the victim restitution.  18 U.S.C. § 3572(a); *United States v. Sydnor*, 762 F. App'x 284, 287 (6th Cir. 2019).  At the time of the PSR in this case, Defendant was unemployed and living in a homeless shelter in New York.  (Doc. #89, *PageID* #1617).  Defendant did not have a monthly income stream, and his net worth was negligible.  *Id.* at 1624.  Defendant did not owe restitution to any of the victims.  *Id.* at 1625.  The PSR concluded that Defendant was unable to pay a fine.  *Id.* at 1624. After considering these findings, the undersigned did not impose fines for either offense beyond the required special assessments under 18 U.S.C. § 3013.

IV.     **Conclusion**

The Court has carefully considered the record in this case, the PSR, and the parties' arguments as well as the § 3553(a) factors.  In doing so, with regard to the conviction of child endangerment, the undersigned sentences Defendant to a 60-day term of confinement with 30 days suspended, a term of probation of 3 years; and a special assessment $10. With regard to the conviction of disorderly conduct, the undersigned sentences Defendant to a term of probation of 1 year, to be served concurrently with the 3-year term of probation in the preceding count, and a mandatory special assessment of $5.  This sentence fully comports with the § 3553(a) factors, taking into consideration Defendant's history and characteristics as well as the need to promote respect for the law, afford adequate deterrence, and protect the public from possible future crimes—especially given the extreme danger to the public that child endangerment presents. Further, Defendant's history and characteristics are more fully set forth in the PSR, which the

17

Court has adopted.  This sentence is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing scheme set forth in § 3553(a).


June 10, 2026                               *s/Peter B. Silvain, Jr.*
                                            Peter B. Silvain, Jr.
                                            United States Magistrate Judge

18